Good morning and welcome to the Ninth Circuit. I'm Judge Nelson and it's a pleasure to be joined by my colleagues, Judge Fletcher and Judge Fisher. Judge Fisher is here visiting and helping us take care of our caseload all the way from the East Coast in the Third Circuit. We have three cases set for argument. I'd ask you just to watch your time, let us know if you want to reserve time for rebuttal, and then just wind up as the time's winding down. We'll go ahead and call the first case set for argument, which is Fair v. Turley, and that's case number 24-1846. We'll hear from Mr. Ford. Good morning, Your Honors. May it please the Court, Corey Ford on behalf of the Parnell Fair. I'll reserve three minutes for rebuttal. Your Honors, this is a Section 1983 post-arrest denial of medical care and excessive force case where the Court at the district level failed to properly apply the qualified immunity analysis at summary judgment. The overall general issue on appeal is that for both of these claims, the district court weighed the evidence, ignored material disputes of fact, and ultimately was able to conclude based on those errors that a reasonable officer would not have known that their conduct violated the Fourth Amendment rights for Mr. Fair. I'll start with the denial of medical care claim, and when you look at the district court order and the facts he relied on there, I'll start with the senior medic, which he deems a key party to the facts. It seems as though his whole order rests upon kind of this idea that the senior medic said he was fine. We're not disputing that he did say he's fine, but at the time that that happens, we need to have context of what happened, which the district court ignored. In that timeframe, the paramedic walks up. Turley claims he has a broken leg to the paramedic. The paramedic says, obviously, he's fine. But what happens after? So what do we know about what the medic did before he said he's fine? Did he just look at him? Did he touch the leg? What did he do? Well, he literally just is walking up from the sonic where the initial where he was initially at and in a passing breath, almost it seems just says he's fine. Keep in mind, Fair has has genes on which the court didn't didn't look at. So it's hard to, you know, know if there's any obvious injury there. So it's literally within that timeframe of him basically walking up and Turley saying those, you know, he's claiming his legs broken. He goes, oh, he's fine. And then what we do see after that is Turley goes, you know, after Fair keeps making complaints, Turley goes, which leg, right? Which leg, your right or your left? So, you know, when the time he says he's fine, you know, neither of them even knew which leg was even possibly injured at that time. And then when we asked him at his deposition, Turley goes, obviously, he didn't check him out. So for the district court to rely on that statement saying that Turley was basically relying on the the medic saying he's fine. Turley knew he hadn't been checked out at that point. Also, Rindeck wasn't even on scene yet. So for him to even rely on that statement is, you know, he obviously couldn't have. Well, but but what I mean, what are the officers supposed to do here? Because they they I assume you'd say they did the right thing. They called a medic. Your complaint seems to be that the medic provided negligent medical advice. But how is an officer supposed to be tasked with determining that? I mean, is he he's supposed to say, well, I don't think you could know that by not looking at him. So he's going to tell the medical staff what they need to do. Yeah. Well, he didn't call the medical order. The medical came over on his own. So he didn't summon medical medical walked over after after the incident. But in terms of we're not saying that, you know, obviously, I get your point on that. But at the time when Turley is, you know, I think Tatum shows us that they need to provide prompt necessary medical attention. Right. And the issue here is there was no medical attention given to him or no medical. There was a doctor there. Right. Or is he a doctor? He's a senior medic. So I think he had a little more a little more training than a normal paramedic would. Yeah. So he's there. So they did provide prompt medical care. Again, your claim seems to be that the medical care was negligent. And that may be. But that's not the issue before us. The question before us is, were the officers justified in relying on that medical advice that they received? Well, I don't think they received any medical. Well, a doctor said he's fine. Yeah. But at that point, he didn't even know which which leg he was. And, you know, I get your point. But, you know, I think it's it's also we're looking at any case. I mean, of course, as you know, there's two issues here. One is whether there was a violation of the Fourth Amendment to prompt qualified immunity. One was whether there's a violation or clearly established. Is there any case which your best case that it's clearly established that an officer can not would violate the Fourth Amendment by relying on incomplete medical advice? I don't know if there's a case directly on all four of those, but I think. But even if it's not on all fours, how close can you get us to this? Because I think that if I'm an officer, I'm thinking the doctor said he's fine. You know, no. Admittedly, we got a problem. The officers probably didn't act completely appropriately after that. They Well, I think in terms of the case, I think you you rely on on Tatum because it's plain. But I think when you're looking at the facts to Turley, Turley here is the only one who hears he's fine. And then when Riddick shows up later, obviously he didn't hear that comment. And he asked Turley, he asked his medical coming over to check him out. Curly says, I don't know. And then Riddick proceeds to call medical and cancel it within the roughly two minutes later on. So it's Austin has more than one interaction with your client, isn't that right? I mean, he's there's there's a little bit of a back and forth. It's not just that one. He's fine. He has some opportunity to observe him. So, right. Yeah, well, I think I think he comes back to the scene. But the language is that when he's asked, he goes, we're going to go get the keys. Do you need us? Turley, after he says he's fine, Turley goes no. And then what we see is we don't see any type of medical evaluation. We look at the pre-hospital report. He's responding to the sonic issue. And then there's a canceled medication or medical care or emergency medical by the officers. In your opinion, does the video show any visible sign of deformity of the leg? I don't think you could because he has jeans on. But I see the screening report when he gets to the hospital. There's an obvious deformity and a right hematoma issue on his calf. So, I mean, obviously, if anyone at the scene, including the paramedic or the officers would have just lifted up the leg, they could likely I'm assuming that that would have been there. Isn't that a condition that's very difficult for an officer who's untrained and as a medic to be able to detect any quicker than what they did by taking him into the station and then getting him to the hospital? Right. I think it's hard to diagnose that that would be an obvious visible injury. So what did they do wrong? But if you look at Tatum also, they rely on Phillips to where there was an internal serious medical issue, right, where the officers summoned the paramedics twice in assessing the objective reasonableness. So I think that, you know, the paramedic checked them out if he even did was I think it's unreasonable to even assume that as well. What part is unreasonable? Their belief that that fair was fine. I don't think their testimony even reflects that they thought the paramedic checked him out. So I think what you see is some language that they actually denied him, denied him the care to have the paramedic come. I think it's a disputed fact, right? You could you could see it one way, you could see it the other way. And I think that's the issue we're having here is, you know, is it, you know, is that a question of fact that needs to go to the jury? As I sort of distill your position, it it seems to me that what you're saying is that the officer should have said to Alstad, the medic, do your damn job. Is that isn't that really what's going on here? That they saw that he didn't do much of a checking him out and they said they're not themselves the experts of it there. They could have seen that the expert didn't check him out. Correct. And I think so. So you're saying that what they should have done is to tell Alstead to do his job? Correct. And I think their training and policies reflect that they're supposed to see that Sergeant Walford, their sergeant who comes to the scene later and we took his deposition. He says that they're supposed to actually see and check, have the paramedic check them out. They even have the ability to if they don't think he did a fair enough job on the medical evaluation to have evaluated. So I think that goes obviously it's not to the binding precedent, but it goes to the reasonableness. Well, but and I guess that brings me back to my I mean, my initial question, is there clearly established law that says it's a violation of the Fourth Amendment to rely on faulty medical advice? So, you know, because it sounds like you do have where I see a dispute of fact is that the medical advice was faulty or not. I mean, I think you have a pretty decent case that there was some negligent medical advice given. But is there is it clearly established that the officers couldn't rely on that or that they had to, as Judge Fletcher said, tell the doctor, I don't think you did a good enough job. You need to do more. I think there's clearly established law in the What is that, though? I think it's that they need to seek the necessary medical attention. And that's what didn't happen. But do any of those cases say I mean, those are cases where no medical attention was sought. Do we have cases where medical attention was sought and it turns out not to be enough? I don't know if we've gotten that far. And I'll just touch on kind of our we have a similar argument in the excessive force, obviously a different kind of fact pattern. But the same thing applies there. It looks like the district court, you know, viewed when you do the facts in favor, it's not a simple situation where the officers came. They believe, you know, the paramedic was checked out and then they basically ultimately made him walk a couple of feet to get him to the jail. Is your excessive force claim against Rindac still alive? No, it's at this point, we're just solely conceding that issue and it's against Turley. But Turley was the main officer who was on the scene and with there throughout the duration. Obviously, there was repeated complaints of the broken leg. What we don't have on body cameras is how we got over to the side. When you say broken leg, it wasn't actually broken, was it? I mean, I'm not trying to minimize the injury. But I'm just saying it wasn't actually broken. It was essentially a dislocated knee. Yeah, yeah. That required amputation ultimately at the end. I mean, this is a horrible case, but it sure looks to me as though the sort of the core of the problem is that the doctors did not treat this properly. I mean, he's he ends up at the hospital that I think 530 in the morning, the events take place sometime around three in the morning, 245, 315. I mean, he's at the hospital pretty fast. Yeah, I think what would happen is the delay at the scene. And, you know, we see Turley, he doesn't even take him. You know, the district court says that he took him right to, you know, doesn't make any differentiation that he took him to the jail to UMC. You know, he took him to the jail, drove him back to Sonic, drove him all the way back to the jail before the medical staff made it clear that he needs to go directly to the hospital. No, that's very clear that he does not take him directly to the hospital. Yeah. So it's that ongoing delay in our position in terms of, you know, whether there was some negligence on the hospital part is that, you know, the delay caused the severe compartment syndrome, which made it harder to diagnose. But the problem here, it seems, is the rarity of this. I mean, this is not this is not an issue where you know, a bone sticking out or, you know, someone who's bleeding that, you know, you have to get to the hospital. Yes, in hindsight, it would have been better for them to go. But again, I almost think it comes back to the same issue because they're relying on the doctor who said, this is fine. Faulty advice sounds like, but they didn't have a reason to believe that there'd be some random problem. I mean, even if it had just been a normal dislocation or even just a break, it wouldn't have been this bad. It was sort of the randomness of what happened that they couldn't have foreseen. And the standard procedure is not to take them directly to the hospital, but to take them to get checked out in the first instance at the jail, which they did. Right. And I'll save some time for rebuttal just to close on that. Just, you know, when you see that screening report, they do note an obvious injury. So, you know, our inference is that that should have been an obvious injury on the scene. And obviously, we didn't have the luxury of him being in shorts that day. He was in jeans. So, I mean, you know, is it reasonable to lift up someone's leg and see if they're faking injury, see if they're injured? You know, our answer is, you know, that's a reasonable thing to do from the officer's standpoint, especially with their training and policy. So, okay, conclude on that. Thank you, Your Honor. Thank you. Good morning. I'm Lisa Anderson. I'm here on behalf of Officer Turley and Officer Rindach of the Las Vegas Metropolitan Police Department. We know from cases of this court, like Tatum, that the critical inquiry is not whether the officers did everything that they could have done, but whether they did what the Constitution requires. Here, they promptly summoned medical assistance and the Constitution did not require more. That's a direct quote from Tatum. In this particular case, we know that Mr. Fair was seen on three separate occasions, each time after the medics were summoned by the Las Vegas Metropolitan Police Department. The first time was within three minutes of Mr. Fair's leg injury. And again, although counsel wants to quarrel with the issue of whether the police at that time had asked the paramedic to come over, the reality of the situation is that the paramedic was at the scene because he had been dispatched by the Las Vegas Metropolitan Police Department through their dispatcher to attend to Mr. Fair. Are these paramedics also employed by the police department? No, they are not. It's a separate entity that the police department does not own direct control or is not an agent of the police department. So it's not as if the paramedic was simply at the Sonic having breakfast or was a bystander that just happened to meander by, who had no obligation or duty whatsoever to attend to Mr. Fair. That was the very reason that he was there in the first instance. Well, were the paramedics called after Fair was tackled or were they called because he was sleeping in the car? The first time they were called because he was sleeping in the car. We know that later that Officer Turley, after the medic had left to walk back across the street, had asked Officer Turley whether the medic was going to come back and whether he was going to look at him. And Officer Turley said, no, I don't know. And so at that point, Officer Rindach made the decision to radio for medical. And within approximately three minutes, we know from the radio that medical was canceled. But importantly, at that time, go back a step. Yes, the medics woke him up in the Sonic drive thru. That's right. And then he took off walking somewhere. Turley arrives. Turley starts chasing him because the medic said something about him. OK. And then he gets tackled. Right. Yes. And then that medic, that senior medic who found him at the drive thru, that's when the senior medic went over and said he was fine. Was it not? Yes, Your Honor. That is correct. So that's that's really the second interaction with fear. Yes. The senior medic saw him at the Sonic, then saw him a second time after he had within three minutes of the tackle into the grass across the street from the Sonic. And then that medic returned and saw him a third time after medical was requested over the radio at, you know, at the at the Sonic. And we see that on body worn camera footage that he has, in fact, returned back and that he is there standing there near Mr. Fair at after the time that medical was canceled. And the radio reflects that medical was canceled because that unit, the unit that the senior medic was part of, had checked Mr. Fair out. That was reported on the radio. It's also reflected in the dispatch notes that that the court has as well. Who canceled it? Pardon me? Who canceled it? Officer Rindac canceled it because he was present when the senior medic returned to the scene and checked Mr. Fair out. We know that they that the senior medic was there the third time or the second time, by your measure, the third time. Yes. What do we do with the argument that I'm now stating it as strongly as I can in favor of Mr. Fair, the argument that the officers should have seen that medic out that didn't check him out at all. Did they have any obligation to say, hey, wait a minute, you didn't do your job? No, your honor. Under clearly established law, as we know it now, they did not. We've cited to you cases. OK, let me get let me give you a different, more extreme example. And I recognize these are not the facts. The we got a medic. They call him over the phone and the medic says, listen, I'm not coming out. I've seen these things before. I don't even need to check him out. He's just fine. Can the officer rely on that? I think that it would be unreasonable in that particular scenario. So so you're saying that at some point the officers have a responsibility to tell the medic to do his job properly? I think that at some that the officers have to be able to utilizing what a lay person would know about a situation to make a reasonable decision under the circumstances that they are confronted with to determine whether they can reasonably rely upon the information that they're being provided. Now, here in this particular scenario, we don't have the type of scenario where, like in the Braunstein, there was a substantial and obvious risk of serious harm to Mr. Fair if he did not receive immediate emergency attention. The officers always knew that Mr. Fair would be transported to the Clark County Detention Center. They know that there's a full medical staff there, including EMTs that would see and evaluate Mr. Fair before he even was admitted to the Clark County Detention Center. And that particular circumstance, coupled with the fact that we have a paramedic that's saying initially that he's fine remaining on the scene for it. First of all, he was there for over twenty five and a half minutes. But in a large part of that, he was standing very close to Mr. Fair in a situation where he could observe him, where he could listen to him, where he heard that complaint. But he never he never lifted up the pant leg. I mean, that that seems to be the issue here, because it sounds like if we don't know. But if he had lifted up the pant leg, he might have seen that this was more egregious. Well, first of all, your honor, he he did lift up the pant leg. We know that because Officer Turley testified to that in his deposition office as Sergeant Walford also testified. Was there any opposing testimony to that? Did they did the did the plaintiff in this case testify that that didn't happen? The plaintiff in this case testified first that it didn't happen. Then he when he was asked clarifying questions in his deposition, he couldn't remember. And when pressed on the issue of why he believed that that had not occurred, the only response that he could give was that it couldn't have happened because if he had been evaluated, he would have went to the hospital. I don't believe that that is the type of justifiable inference that would override all of the objective facts that we know about this particular scenario that occurred at the time. So earlier you made the case that there's no clearly established law and that may be correct. But as to the constitutional violation, are there facts that could go to a constitutional violation here or you say no, because it was objectively reasonable for the officers to rely on the medical advice in this in this case? I believe that there was no constitutional violation because, again, turning back to the language in Tatum, they did, in fact, promptly summon medical care, whether we define prompt as the initial three minutes. He's fine. Whether we define it as the second or the third time when the paramedic was there. And, you know, and after he had been there for well over six minutes standing there observing Mr. Fair, listening to his complaints and and let's not forget that the paramedic testified in his deposition that this would not require any type of a substantial medical evaluation, that it would largely be visual, that he wouldn't even necessarily need to go up under the pant leg to look because there was no sign of a bone that a lot of times he could see whether a bone was protruding even through the. Yeah, but I mean, I'm not a doctor, but it seems like if you want to find out if there's a broken leg, you look at the leg. I don't disagree with you. But again, then we're second guessing what a paramedic is testifying to under oath and our cases, whether we look at the Seventh Circuit case that we cited in our brief or the Ninth Circuit's decision in Lemire, which was a 14th Amendment case. It is. Can I ask just quickly? Sure. Is this I was. Are these Fourth Amendment claims or Eighth Amendment claims? They are. They were pled under a Fourth Amendment. OK. Yes. And it's not Eighth Amendment because at that time he had not been convicted. Yes. But the court has looked at this in the context of the 14th Amendment as well, which is where we get to that notion of what was really necessary at the time anyway, whether you know, and what does prompt mean? Because, again, we don't have any objective evidence of a serious medical need that required immediate emergency attention. That could result in serious harm to Mr. Fair. Anderson, let me ask you this. After the senior medic gave his opinion that he was fine, doesn't the video depict the leg protruding in an irregular fashion that might alert the officer that maybe the medic's opinion wasn't accurate? I know that that the counsel for the appellant is making that argument. But again, we're looking at that with the benefit of hindsight first. And we're looking at that, knowing that we're looking at it with the benefit of the video. Yes. Under Scott versus Harris, there's a standard under which we look at that evidence. Understood. But at the same time, it has to be looked at within the context of the situation. The officer testified that he did not see that at the time. And how do we evaluate that? Because, I mean, our case law says if the video contradict if the video contradicts testimony, we rely on the video. I mean, are we are we supposed to if let's let's say we went back and watched the video and you can see her totally looking at it, pointing at it, saying something to his his fellow officer about, whoa, did you see that? Would that be a different case? Because we'd look at that and say, wait, he he should have been on notice at that point that there was something different here. I don't believe so. Again, Your Honor, because it gets back to that same notion, which is that we have a very qualified medical professional there who says that he's fine, does not change that opinion the entire time that he's on the scene, despite being there and having the opportunity to observe Mr. Fair and the officer or excuse me, the medical the senior medic was there at the time that the leg appeared twisted. I don't I do not recall, Your Honor, but Officer Turley very definitively testified in his deposition that he did not see anything like that. I personally did not see anything like that until I knew to look for it because of the arguments that were being made to the court. So, you know, when we're looking at something with the benefit of hindsight, which in these cases we shouldn't do, and we know what we're looking for or we slow down the video to look for it. That's a completely different situation than when we have a dynamic situation on the scene where the officer is dealing with a number of things, including a foot pursuit, a person who's claiming injury, you know, being alone in the middle of the night across the street with an arrestee, needing to cancel a code red, needing to get other units over there and to do his investigation into the issues that surround the arrest. And so, again, I think we have to go back to the notion, which is that, you know, like the district court stated, the key party in the facts of this case is the senior medic. We have a trained medical professional there. That medical professional remained there for an extended period of time. He had the ability and the duty to take Mr. Fair in the ambulance that he had there if he believed that he was in need of immediate emergency medical attention. And the fact of the matter is that unless the senior medic had been a vascular surgeon or the officers had been vascular surgeons, no one could have known or anticipated that this very simple leg injury. Well, that's a little bit overstated because he didn't see a vascular surgeon at the fair, did not see a vascular surgeon when he went to the correctional facility, and yet they identified it as a problem. So, I mean, I get your point, but I mean, I think we just need to be careful about what standard we're setting here. I mean, by the standard and your honor, what I meant by that, just to be clear, was not that he didn't need any medical attention, but that it wasn't that there wasn't a necessity for immediate, you know, emergency medical. My point is a basic doctor at the correctional facility understood he needed it as soon as they looked at it. That's kind of the conundrum is there was the sense that if the senior medic had actually looked and you say he did, but if he'd actually looked at it, he might have seen that. I guess we don't know that. But to a certain degree, that doesn't matter because the senior medic is not a defendant here. We're only dealing with the officers. Yes, your honor. And that raises another important point that goes to some of the comments that the court has made, because this case was largely brought initially as a medical malpractice case. And the plaintiff's own medical expert identified, among other things, that had there been a medical professional at the scene, that that medical professional's actions were negligent as well. And with that, your honor, we believe that there was no Fourth Amendment violation and that if there were, that there was no clearly established law that would take this case outside of qualified immunity. Thank you. Thank you. Thank you, your honors. Just to touch on a few points, I think largely those facts are the way Metro views them. When you do them in favor of fair, I don't think those are actually the facts you rely on. When you look at the paramedic, he was asked at his deposition, he was shown his pre-hospital care report. There was nothing on that pre-hospital care report that would show he did any type of evaluation. And when we asked him, is that generally your practice when you evaluate someone to put something in that report? He said yes. And then when we asked him, did you perform any medical evaluation at the scene? He didn't remember what he was doing that day. The district court says he was obvious deformities at the scene. That was an assumption he made based off watching the video in hindsight. So we don't have in the video, we have the luxury of the video here, right? So there's no indication that he did any type of physical inspection of his leg. There's no indication that the pant leg was ever lifted up by anyone at the scene. We have the video. It's all on there. In the time frame from when RINDEC calls medical and cancels it, the body camera footage is off. And pursuant to training, they're supposed to have their body camera footage on when there is a medical check. So we don't have any confirmation from either of the offers. There's a firm confirmation. Their admissions say that there wasn't a medical evaluation on the scene. So there wasn't actually necessary medical attention given to Mr. Fair at the scene. Okay. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: FLETCHER, Fisher, NELSON